UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIGUEL A. GONZALEZ,

          Petitioner,

    v.

CONNIE GIPSON, warden,

          Respondent.

Case No.  14-cv-04995-EMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.    INTRODUCTION

Miguel A. Gonzalez filed this *pro se* action for a writ of habeas corpus under 28 U.S.C. § 2254.  The Court issued an order to show cause why the writ should not be granted.  Respondent has filed an answer and Mr. Gonzalez has filed a traverse.  For the reasons explained below, the petition will be **DENIED**.

## II.    BACKGROUND

On April 15, 2008, Mr. Gonzalez entered a guilty plea in Santa Cruz County Superior Court to four felonies in four separate cases in a bundled plea agreement.  He pled guilty to aiding and abetting a felony assault in Case No. F16220, assault with a deadly weapon while on bail or own recognizance in Case No. WF00200, armed robbery with a deadly weapon in Case No. WF00210, and assault with a deadly weapon with personal infliction of great bodily injury and a gang enhancement in Case No. WF00212.[1]  Mr. Gonzalez was sentenced on July 15, 2008 to 12 years in state prison.  No appeal was taken.  Mr. Gonzalez did file petitions for writ of habeas

---

[1] The first crime occurred on January 10, 2007; the second crime occurred at about 7:00 p.m. on February 29, 2008; the third crime occurred at about 8:45 p.m. on February 29, 2008; and the fourth crime occurred at about 12:30 a.m. on March 1, 2008.  *See* Resp. Ex. I (probation officer's presentencing report).

United States District Court
For the Northern District of California

corpus in the state courts.

The petition for writ of habeas corpus in this action challenges only one of the four convictions covered by that plea agreement.  Specifically, Mr. Gonzalez challenges his conviction in Case No. WF00200.  Three years of the 12-year sentence are attributable to Case No. WF00200, as Mr. Gonzalez received one year for the assault with a deadly weapon plus two years for committing the crime while out of jail on bail or on his own recognizance.

A.    The Crime

The probation officer's presentencing report provided the following summary of the crime. (Unlike the presumption of correctness that applies to a state court's factual findings, see 28 U.S.C. § 2254(e), no presumption of correctness applies to the probation officer's statement of the facts.)

> On February 29, 2008, at approximately 7:22 p.m., officers were dispatched to 580 Auto Center Drive regarding a large fight that had just occurred.  Upon arrival, officers made contact with two victims, Jorge Mendoza and Jaime Mendoza.  Both victims had been stabbed.  Jorge was noticeably bleeding from his chest and left area and Jaime had a stab wound to his left hand.  Medical personnel treated the injured parties and Jorge was transported to the hospital via an ambulance.
>
> Jaime Mendoza sustained a puncture wound on his left forearm and a puncture wound to his left hand.  Jorge Mendoza sustained a puncture wound to his right forearm, a puncture wound to the left side of his chest, two puncture wounds to the front of his left shoulder, two puncture wounds to the upper rear of his left shoulder and a swollen right eye.  Jorge Mendoza had to be life flighted to a nearby trauma center in San Jose due to the extent of his injuries.
>
> Jorge Mendoza's younger son, Jorge Jr., and witness to the events was contacted and reported that at 7:00 p.m., he was at the bowling alley with his son and nephew.  After bowling, Jorge Jr. called his father, Jorge and his brother, Jaime, to pick them up.  They all met up and were walking towards the exit when he noticed five to six Hispanic male adults and juveniles outside.  Jorge Jr. had never seen the group of males before.  As they were walking out, one of the subjects walked up to his brother, Jaime and began what seemed like a friendly conversation.  While the two were talking, another subject opened the door and told the first subject to "Come outside" in Spanish.  Everyone walked outside, and once they were outside, the second subject swung at Jaime with a closed fist.  Jorge Jr. advised that he rushed the second subject, but then saw that his father, Jorge, was being jumped by several subjects.  Jorge Jr. did not recall seeing any weapons and stated that since everything happened so quickly, it was difficult to see whom had punched whom.

2

> Jaime Mendoza reported that he was familiar with the suspects that had attacked him and provided the nicknames, "Termite," "Peligroso" and "Boxer." Jaime mentioned that these three males were members of the Watsonville criminal street gang, City Hall Watsonville. During the course of the investigation, officers figured out that Pedro Garcia Zuniga goes by the moniker, "Termite" and that "Peligroso" was listed as a moniker for Miguel Angel Gonzalez. Jaime Mendoza was later shown photo lineups of both suspects, and positively identified them as his attackers. Jaime related that Zuniga was the one [who] challenged him to a fight and that Gonzalez had stabbed his father Jorge approximately six times with an unknown object.
>
> On March 1, 2008, at approximately 12:55 a.m., while officers were responding to a stabbing that occurred on Eureka Canyon Road, a felony car stop was made. Both Zuniga and Gonzalez were found in the vehicle and taken into custody.

Resp. Ex. I at 4-5. (The stabbing on Eureka Canyon Road led to the charges in Santa Cruz County Superior Court Case No. WF00212.)

**B.    The Sole Eyewitness Recants And Habeas Challenges Ensue**

Although Jaime Mendoza initially identified Mr. Gonzalez as the man who stabbed his father Jorge Mendoza, Jaime Mendoza later changed his story and denied that Mr. Gonzalez had stabbed his father. Jaime Mendoza's changing story led to state habeas proceedings and forms the basis for all of Mr. Gonzalez's federal habeas claims.

In 2011, Mr. Gonzales filed a *pro se* habeas petition in the Santa Cruz County Superior Court. That court eventually issued an order to show cause on a claim regarding newly discovered evidence and appointed counsel for Mr. Gonzalez. An evidentiary hearing was held on May 2, 2013, at which Jaime Mendoza and other witnesses testified. On May 24, 2013, the superior court filed an order denying the habeas petition. Mr. Gonzalez later filed habeas petitions in the California Court of Appeal and the California Supreme Court; both petitions were denied without comment.

Mr. Gonzalez then filed this action. In his federal petition for writ of habeas corpus, Mr. Gonzalez alleges that his guilty plea and the conviction in Case No. WF00200 violated due process and must be set aside because (1) they were "obtained by [the prosecution's] known use of false evidence," Docket No. 1 at 6; (2) the prosecutor withheld exculpatory *Brady* evidence; and (3) he is actually innocent. The Court issued an order to show cause why the writ should not be

United States District Court

For the Northern District of California

granted.  Respondent has filed an answer and Mr. Gonzalez has filed a traverse.  The matter is now ready for a decision on the merits.

### III.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Santa Cruz County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.  STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A

federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

# V.   **DISCUSSION**

A.   The Recanting Witness

Jaime Mendoza initially identified Mr. Gonzalez as the man who stabbed his father, but later changed his story and denied that Mr. Gonzalez stabbed his father. Over the course of time, Jaime Mendoza went from initially stating that Mr. Gonzalez stabbed him and his father, to stating that Mr. Gonzalez stabbed only his father, to stating that Mr. Gonzalez did not stab his father. Jaime Mendoza's statement was the only evidence identifying Mr. Gonzalez as the stabber. Docket No. 2 at 37-39 (stipulation in state habeas proceedings that Jamie Mendoza's statement is the only witness against Mr. Gonzalez). Jaime Mendoza's changing story forms the basis for all of Mr. Gonzalez's federal habeas claims. To analyze the claims, it is first necessary to set out a chronology of events, with a summary of Jaime Mendoza's several statements.

- February 29, 2008 - Jaime and Jorge Mendoza, Sr. are stabbed. Jaime Mendoza tells police that Peligroso stabbed him and his father.

- March 1, 2008 - Jaime Mendoza picks Mr. Gonzalez in a photo lineup.

- March 11, 2008 - Jaime Mendoza tells defense investigator that Mr. Gonzalez stabbed him and his father.

- April 15, 2008 - Mr. Gonzalez pleads guilty in a bundled plea deal.

- July 15, 2008 - Mr. Gonzalez is sentenced.

United States District Court
For the Northern District of California

- July 17, 2008 - Pedro Zuniga's preliminary hearing is held.
  Jaime Mendoza testifies that Mr. Gonzalez stabbed his father but he (Jaime) did not see who stabbed him (Jaime).
  Jaime Mendoza allegedly tells police officers before the hearing that he is recanting.  Prosecutor learns from Mr. Zuniga's public defender that Jaime Mendoza is recanting.

- May 25, 2011 - Jaime Mendoza tells defense investigator that Mr. Gonzalez was not involved in either stabbing.

- January 8, 2012 - Jaime Mendoza fully recants.  He states in a declaration that he lied to the police and lied in court at Mr. Zuniga's preliminary hearing.  He states further that Mr. Gonzalez was not involved in stabbing him or his father.

- May 2, 2013 - Evidentiary hearing on Mr. Gonzalez's habeas petition is held in Santa Cruz County Superior Court.
  Jamie Mendoza testifies that Mr. Gonzalez did not stab him or his father.

The above time-line shows the sequence and essence of the changing statements.  It also is helpful to note the substance of some of the statements.

The police reports indicate that Jaime Mendoza identified Mr. Gonzalez, who was also referred to as "Peligroso" of "City Hall" as the person who stabbed both Jaime and Jorge Mendoza, Sr.  Docket No.  2 at 6-20.

At Mr. Zuniga's preliminary hearing, on July 17, 2008, Jaime Mendoza identified Mr. Gonzalez as the man who stabbed his father, but testified that he did not remember who stabbed him (i.e., Jaime Mendoza).  Docket No. Ex. 8-5, July 17, 2008 hearing RT 18, 19, 27.  Jaime Mendoza denied that Mr. Zuniga took part in the stabbing, although he had told police on the night of the stabbing that Mr. Zuniga was one of the attackers.  *Id*. at 21.  Jaime Mendoza testified that he had known Mr. Gonzalez for about two years; he denied knowing anything about Mr. Gonzalez's gang affiliation; and he denied telling his mother and sister in a phone call after the stabbing that they had been "jumped by City Hallers," a Watsonville gang.  *Id*. at 27, 30-31, 33. Jaime Mendoza testified that on March 13, 2008 -- two weeks after stabbing -- someone tried to set his car on fire; although he no longer thought it was in retaliation for talking to the police, he would not identify who set the car on fire.  *Id*. at 47, 49.  At Mr. Gonzalez's evidentiary hearing in 2013, Jaime Mendoza testified that he was not telling the truth at the Zuniga preliminary hearing when he identified Mr. Gonzalez as the man who stabbed his father.  Docket No. 8-2, May 2, 2013 hearing RT 13.  When asked by the court why he testified at the Zuniga preliminary hearing that

Mr. Gonzalez stabbed his father if he had just told the police outside the courtroom that it was a lie, Jaime Mendoza insisted that he did testify at the preliminary hearing that Mr. Gonzalez did not stab his father. *Id.* at 21-22.  Jaime Mendoza later backtracked after being shown his testimony from the Zuniga preliminary hearing at which he identified Mr. Gonzalez as the man who stabbed his father. *Id.* at 38.  Later, when the court asked him why he had not told the judge at the Zuniga preliminary hearing that everything he had said to the police had been a lie, Jaime Mendoza responded, "because nobody asked me" and he "really [did not] know about court." *Id.* at 50.  Jaime Mendoza testified that he told officer McKinley that he felt he and his family were in jeopardy after he (Jaime) provided the names of the attackers. *Id.* at 29.  Jaime Mendoza testified that he did not think that his car had been set on fire in retaliation and denied that he had told officers that it was retaliatory, although once shown the police report, he agreed that he told an officer that it was retaliatory. *Id.* at 34-36).  He also testified that in 2012, three unknown men tried to break into his house and he "got in a little scuffle" with them before they fled. *Id.* at 36-37.  Jaime Mendoza testified that he "just wanted to move on with [his] life," wanted this case to be over with, and was worried about his and his family's safety when he signed the declaration recanting his identification of Mr. Gonzalez, yet claimed not to be afraid at the evidentiary hearing. *Id.* at 42-43, 53.

At the end of the evidentiary hearing on Mr. Gonzalez's habeas petition, the superior court discussed the standards for obtaining relief in state court and determined that Mr. Gonzalez had not met the standard. *Id.* at 99-102.

B.     *Brady* Claim

    1.     Background

Mr. Gonzalez contends that the prosecutor failed to disclose to him that Jaime Mendoza had recanted his identification of Mr. Gonzalez as the stabber.  This, contends Mr. Gonzalez, violated his rights under *Brady v. Maryland* and its progeny.

This claim was rejected without comment by the California Supreme Court.  Docket No. 1 at 48.  There is no lower state court decision containing a reasoned explanation for the denial of the *Brady* claim.  The Santa Cruz County Superior Court did not adjudicate the *Brady* claim.  Mr.

Gonzalez did not present a *Brady* claim in his original petition or his first amended petition in that court. The evidentiary hearing that was held in the Santa Cruz County Superior Court on May 2, 2013 appears to have been devoted exclusively to determining whether Mr. Gonzalez had demonstrated actual innocence under state law standards. After that evidentiary hearing, the superior court orally denied the petition and directed respondent's counsel to prepare a written order memorializing that ruling. Before the written order was prepared, Mr. Gonzalez sought leave to file a motion to amend his first amended habeas petition to add a *Brady* claim. The superior court denied his request for leave to file a motion to amend. Docket No. 8-3 at 4 (May 24, 2013 superior court order). Because Mr. Gonzalez was not allowed to amend, the superior court did not actually rule on the merits of the *Brady* claim.

Even if the Santa Cruz County Superior Court's denial of Mr. Gonzalez's request for leave to file a motion to amend his first amended petition is considered to be a denial of his *Brady* claim, there was no reasoning articulated for such a denial. Moreover, the superior court did not have the same evidence in support of the *Brady* claim that Mr. Gonzalez marshaled for his petitions for writ of habeas corpus to the California Supreme Court and to this court. At the time the superior court denied Mr. Gonzalez's request for leave to amend, Mr. Gonzalez had not yet obtained or presented his investigator's declaration that (a) the prosecutor said he had learned before the Zuniga preliminary examination that Mr. Gonzalez was recanting, and that the prosecutor had learned about the recantation from a report obtained from Mr. Zuniga's counsel, and (b) police officers were aware of the recantation before the Zuniga preliminary examination. For all these reasons, the Santa Cruz County Superior Court's decision is not the decision to which § 2254(d) is applied for purposes of evaluating the *Brady* claim.

When, as here, the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

1    Here, the claim was presented to and rejected without comment by the California Supreme

2    Court.

3        2.    <u>Analysis</u>

4        In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression

5    by the prosecution of evidence favorable to an accused upon request violates due process where

6    the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith

7    of the prosecution." *Id.* at 87.  The Supreme Court has since made clear that the duty encompasses

8    impeachment evidence as well as exculpatory evidence.  *See United States v. Bagley*, 473 U.S.

9    667, 676 (1985).  "[E]vidence is 'material' within the meaning of Brady when there is a

10   reasonable probability that, had the evidence been disclosed, the result of the proceeding would

11   have been different." *Cone v. Bell,* 556 U.S. 449, 469–470 (2009). "A reasonable probability does

12   not mean that the defendant 'would more likely than not have received a different verdict with the

13   evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence

14   in the outcome of the trial.'" *Smith v. Cain*, 132 S. Ct. 627 (2012) (alteration in original).

15       Here, Jaime Mendoza's statements recanting his identification of Mr. Gonzalez as the

16   stabber would be *Brady* material if they had not been disclosed before a trial.  The statements were

17   favorable to Mr. Gonzalez and were not disclosed to him.  The statements would have met the

18   materiality standard.  Evidence that impeaches an eyewitness "may not be material if the State's

19   other evidence is strong enough to sustain confidence in the verdict," but such is not the case when

20   the eyewitness' testimony is the only evidence linking the defendant to the crime.  *Smith*, 132 S.

21   Ct. at 630 (overturning conviction because undisclosed evidence that eyewitness told police

22   detective at the time of the crime that he could not see or identify the perpetrators was "plainly

23   material" impeachment material where that eyewitness testified that defendant was the perpetrator

24   and his testimony was the only evidence implicating defendant in the crime).  Here, Jaime

25   Mendoza's statements were exculpatory rather than just impeachment material, because (unlike

26   the witness in *Smith*) he did not merely state that he could not see who stabbed his father but

27   affirmatively stated that Mr. Gonzalez was not the person who stabbed his father.

28       The problem for Mr. Gonzalez is that the nondisclosure of the exculpatory materials

9

occurred in a case in which he pled guilty rather than went to trial.  To obtain federal habeas relief, he must show that the California Supreme Court's rejection of his claim was contrary to, or an unreasonable application, of a U.S. Supreme Court holding, but the U.S. Supreme Court has never issued a holding covering his circumstances.  The U.S. Supreme Court has never held that disclosure of *exculpatory Brady* material is required *before* a guilty plea is entered.  The only U.S. Supreme Court case addressing *Brady* material in the guilty-plea context addressed impeachment material and held that disclosure of *impeachment Brady* material is not required before a guilty plea is entered.  *United States v. Ruiz*, 536 U.S. 622, 633 (2002).

In *Ruiz*, the U.S. Supreme Court held that the "Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant."  *Ruiz*, 536 U.S. at 633.  By pleading guilty, a defendant "foregoes not only a fair trial, but also other accompanying constitutional guarantees," such as the privilege against self-incrimination, as well as the rights to confront one's accusers and to trial by jury.  *Id.* at 628-29 (citing *Boykin v. Alabama*, 395 U.S. 238, 243 (1969)).  "Given the seriousness of the matter, the Constitution insists, among other things, that the defendant enter a guilty plea that is 'voluntary' and that the defendant must make related waivers 'knowing[ly], intelligent[ly], [and] with sufficient awareness of the relevant circumstances and likely consequences.'"  *Id.* at 629 (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970) (alterations in original)).  But this does not necessarily mean that impeachment information must be disclosed before a guilty plea may be entered.  *See id.*

> [I]mpeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary* ("knowing," "intelligent," and "sufficient[ly] aware").  Of course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be.  But the Constitution does not require the prosecutor to share all useful information with the defendant.  *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S. Ct. 837, 51 L.Ed.2d 30 (1977) ("There is no general constitutional right to discovery in a criminal case").  And the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances--even though the defendant may not know the *specific detailed* consequences of invoking it.  A defendant, for example, may waive his right to remain silent, his

> right to a jury trial, or his right to counsel even if the defendant does
> not know the specific questions the authorities intend to ask, who
> will likely serve on the jury, or the particular lawyer the State might
> otherwise provide.

*Ruiz*, 536 U.S. at 629-30 (second alteration in original).  The Supreme Court also explained that

the Constitution "does not require complete knowledge of the relevant circumstances" before a

defendant may plead guilty.  *Id.* at 630.  The *Ruiz* Court rejected the Ninth Circuit's view that a

guilty plea is not voluntary unless the prosecutors first made the same disclosure of material

impeachment information that the prosecutors would have to make under *Brady* if the defendant

chose to go to trial.  *See id.* at 629, 632.

There is disagreement in the lower courts as to whether *Ruiz* applies to exculpatory

evidence, as discussed in *Robertson v. Lucas*, 753 F.3d 606, 621 (6th Cir. 2014):

> *Ruiz* established that *impeachment* material need only be disclosed
> for trial. *See United States v. Wells*, 260 F. App'x. 902, 903–04 (6th
> Cir.2008). Appellants contend that the evidence at issue was
> *exculpatory* and therefore not covered by the rule set forth in *Ruiz*.
> We have not yet had occasion to determine whether *Ruiz* applies to
> exculpatory *Brady* material, a question that has caused some
> disagreement among our sister circuits. *Compare United States v.
> Ohiri*, 133 F. App'x. 555, 562 (10th Cir.2005) ( "[T]he Supreme
> Court did not imply that the government may avoid the consequence
> of a *Brady* violation if the defendant accepts an eleventh-hour plea
> agreement while ignorant of withheld exculpatory evidence in the
> government's possession.") *and McCann v. Mangialardi*, 337 F.3d
> 782, 788 (7th Cir.2003) ("*Ruiz* indicates a significant distinction
> between impeachment information and exculpatory evidence of
> actual innocence."), *with Friedman v. Rehal*, 618 F.3d 142, 154 (2d
> Cir.2010) ("[T]he Supreme Court has consistently treated
> exculpatory and impeachment evidence in the same way for the
> purpose of defining the obligation of a prosecutor to provide *Brady*
> material prior to trial, and the reasoning underlying *Ruiz* could
> support a similar ruling for a prosecutor's obligations prior to a
> guilty plea.") (internal citations omitted) *and United States v.
> Conroy*, 567 F.3d 174, 179 (5th Cir. 2009) ("*Ruiz* never makes such
> a distinction nor can this proposition be implied from its
> discussion.").

*Robertson,* 753 F.3d at 621.[2]  The Ninth Circuit has not yet decided, in a case to which the

---

[2] The source of the disagreement in the circuits about the applicability of *Ruiz* to exculpatory
evidence appears to stem from the particular circumstances in *Ruiz*.  In *Ruiz*, the plea agreement
pursuant to which the defendant pled guilty had provisions stating that "any [known] information
establishing the factual innocence of the defendant ' 'has been turned over to the defendant,'"
acknowledged the Government's "'continuing duty to provide such information,'" and required
the defendant to waive the right to receive impeachment information and information about any

**United States District Court**
For the Northern District of California

1   AEDPA applied, whether *Ruiz* does or does not require disclosure of exculpatory *Brady* material.

2        Given the lack of a holding from the U.S. Supreme Court that exculpatory *Brady* material

3   must be disclosed before a defendant pleads guilty, the California Supreme Court's rejection of

4   Mr. Gonzalez's claim cannot be said to be "contrary to, or an unreasonable application of, clearly

5   established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. §

6   2254(d)(1).  Indeed, the divergence of views among the circuits as to whether *Ruiz* requires or

7   does not require disclosure of exculpatory *Brady* material shows that "fairminded jurists could

8   disagree," *Harrington v. Richter*, 562 U.S. at 102, as to whether the California Supreme Court's

9   rejection of Mr. Gonzalez's claim is inconsistent with a prior decision of the Supreme Court.  "[A]

10  state court's determination that is consistent with many sister circuits' interpretations of Supreme

11  Court precedent, even if inconsistent with [the Ninth Circuit's] own view, is unlikely to be

12  'contrary to, or involve an unreasonable application of, clearly established Federal law, as

13  determined by the Supreme Court.'" *Kessee v. Mendoza-Powers*, 574 F.3d 675, 677 (9th Cir.

14  2009); *see e.g., Carey v. Musladin*, 549 U.S. 70, 76-77 (2006) (noting that lower courts' wide

15  divergence in treatment of spectator misconduct claims reflected "lack of guidance" from Supreme

16  Court, and thus "it cannot be said that the state court unreasonably applied clearly established

17  Federal law"); *Mann v. Beard*, 2016 WL 1583665, at *2 (9th Cir. Apr. 20, 2016) (unpublished)

18

19  _____

20  affirmative defense the defendant might raise at trial.  *Ruiz*, 536 U.S. at 625 (alteration in original).
    The defendant refused to agree to the plea agreement because of the waiver of the right to receive

21  impeachment and affirmative defense evidence.  *Id.*  Later, she pled guilty without any plea
    agreement and was denied a two-level downward departure in sentencing that the government

22  would have recommended had she accepted the plea agreement.  *Id.* at 626. To resolve whether
    the plea agreement was constitutionally impermissible and the defendant should be resentenced,

23  the Supreme Court had to "decide whether the Constitution requires preguilty plea disclosure
    of impeachment information."  *Id.* at 629.   The Supreme Court couched its discussion in terms of

24  impeachment evidence, and specifically pointed out that the proposed plea agreement included a
    representation that the Government would turn over any information establishing factual

25  innocence of the defendant.  *Id.* at 630-31.

26       Some courts that have found that *Ruiz* does support a right to exculpatory *Brady* material
    in the guilty-plea context appear to rest their conclusions on the fact that the Supreme Court in

27  *Brady* focused on impeachment evidence and took pains to note that the Government retained the
    obligation under the plea agreement to disclose evidence establishing factual innocence.  Courts

28  that have gone the other way have relied on the Supreme Court's longstanding lack of a distinction
    between exculpatory and impeachment evidence for *Brady* purposes, as well as the fact that the
    exculpatory evidence question was not actually presented or resolved in *Ruiz*.

("Indeed, in light of this circuit's own split, fairminded jurists could disagree whether the . . . filing of a felony complaint . . . triggered the protections of the Sixth Amendment."). Mr. Gonzalez is not entitled to relief on his *Brady* claim.

The Court notes that there are some evidentiary gaps about the *Brady* material in this case, but those gaps need not be filled because relief on the *Brady* claim is barred by § 2254(d)(1) due to the absence of a Supreme Court holding on point. The first gap in the evidence is that it is unclear exactly when the prosecutor and police became aware that Jaime Mendoza was recanting. Mr. Gonzalez's evidence shows that the prosecutor and one or more police officers were aware of some sort of recantation *before* the Zuniga preliminary hearing, but does not show how far in advance of the Zuniga preliminary hearing they became aware of the recantation. If a *Brady* claim could be entertained, the timing could matter because Mr. Gonzalez was sentenced two days before the Zuniga preliminary hearing, and the prosecution may not even have known of the recantation at the time of Mr. Gonzalez's sentencing (as would have occurred if, for example, the prosecutor and police only learned of the recantation on their way into court on the day of the Zuniga preliminary hearing).[3] The second gap concerns the source of the information provided to the prosecution. The prosecutor told Mr. Gonzalez's investigator that he learned of the recantation from a report provided by Zuniga's public defender, yet the investigator (who presented a detailed declaration about his efforts to learn whether and when the prosecution learned of the recantation) provides no information as to any efforts to obtain the report from Mr. Zuniga's public defender or to ask that public defender when he shared the information with the prosecutor. It is at least odd that a petitioner's presentation of his claim that was otherwise quite thorough would not include information about the report obtained from Mr. Zuniga's public defender. If Mr. Zuniga's public defender did not share the report with the prosecution until the day of the Zuniga preliminary

---

[3] There is disagreement among the circuits as to how long the *Brady* duty continues. *Compare Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003) (*Brady* duty applies, before and during trial, as well as after conviction), *and Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (*Brady* duty includes information obtained during and even after trial), *with Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008) (declining to extend *Brady* to post-trial witness' favorable treatment), *and United States v. Maldonado-Rivera*, 489 F.3d 60 (1st Cir. 2007) (evidence unknown to prosecutor until after trial is not *Brady* material).

**United States District Court**
For the Northern District of California

hearing, it would provide further support that the prosecutor was not aware of the *Brady* material at Mr. Gonzalez's sentencing hearing two days earlier.  As noted above, however, the absence of a Supreme Court holding precludes relief on the *Brady*  claim so the gaps in the evidence to support the claim need not be filled.  Mr. Gonzalez is not entitled to relief on his *Brady* claim.

C.      *Napue* Claim

1.      Background

Mr. Gonzalez also contends that his plea should be set aside because it was based on the prosecutor's knowing presentation of false evidence.  He contends that his "guilty plea was induced by false evidence presented at his change of plea and sentencing hearing in the form of an offer of proof."  Docket No. 1 at 28.  He urges that the prosecutor "knew or should have known that Jaime Mendoza" was not implicating Mr. Gonzalez in the stabbing.  *Id.*

At the change-of-plea hearing on April 15, 2008, after Mr. Gonzalez was advised of and waived his rights, the following occurred:

> [THE COURT:]    Turning to WF00200, let me get the plea first.
>
> THE DEFENDANT:   Guilty.
>
> [THE PROSECUTOR]:  Your Honor, the factual basis for this case is that in the City of Watsonville the defendant assaulted Jorge Mendoza, Sr, causing great bodily injury or causing serious bodily injury nearly within the meaning of Penal Code Section 245 not as a separate and discreet allegation.
>
> THE COURT:  Factual basis, how do you plea that on or about March 1st of '08 in the County of Santa Cruz you did violate Penal Code Section 245(a)(1) which is a felony and again committed assault by means of force likely to produce great bodily injury, how do you plead?
>
> THE DEFENDANT:   Guilty.
>
> THE COURT:   I accept that plea as being freely and voluntarily made.

4/15/08 RT at 11-12.  At the sentencing hearing two months later, an issue arose as to the proper calculation of the sentence to reach the agreed-upon 12-year prison sentence for the several offenses.  The parties and the court determined to solve the problem with Mr. Gonzalez admitting that he committed the assault on Jorge Mendoza, Sr., while he was out on his own recognizance.

14

7/15/08 RT at 9.  The facts of the crime were not discussed at the sentencing hearing.

The California Supreme Court rejected the *Napue* claim without discussion.  When, as here, the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Harrington*, 562 U.S. at 102.

2.      Analysis

A fundamental principle guiding the conduct of the prosecutor, as the representative of a sovereign in this country, is "not that it shall win a case, but that justice shall be done."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  From this principle flow the rules that the prosecutor may not hide evidence and may not let false evidence go uncorrected at trial.  *Cf. Strickler v. Greene*, 527 U.S. 263, 280-82 (1999).  When a prosecutor obtains a conviction by the use of testimony which he knows or should know is perjured, the conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury.  *See United States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (same result obtains when State, although not soliciting false evidence, allows it to go uncorrected when it appears).  This principle applies to matters of witness credibility as well as direct evidence of guilt. *See Napue*, 360 U.S. at 269.  To prevail on a claim of prosecutorial misconduct for use of false witness testimony, a petitioner must show that (1) the testimony was actually false, (2) the prosecution knew or should have known that the testimony was false, and (3) the false testimony was material.  *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (citing *Napue*, 360 U.S. at 269-71); *see also Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (prosecutor's action in presenting false evidence to the jury and by failing to correct the record violated petitioner's rights).

For a *Napue* claim, false testimony is material if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States. v. Agurs*, 427 U.S. 97, 103 (1976).  "This materiality standard is, in effect, a form of harmless error review, but a

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

far lesser showing of harm is required under *Napue*'s materiality standard than under ordinary harmless error review. *Napue* requires [the court] to determine only whether the error *could* have affected the judgment of the jury, whereas ordinary harmless error review requires [the court] to determine whether the error *would* have done so." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013) (citations omitted).

Mr. Gonzalez argues that his guilty plea "was induced by false evidence presented at his change of plea and sentencing hearing in the form of an offer of proof." Docket No. 1 at 28. Mr. Gonzalez's *Napue* claim falters on all three prongs. First, Mr. Gonzalez has not shown that the prosecutor's statement of the factual basis[4] for a plea amounts to testimony or evidence, such that it comes under the *Napue* rule. Second, he has not shown that the statement was false, at least expressly so. The prosecutor did not mention Jaime Mendoza, let alone make a representation about Jaime Mendoza's veracity. Third, even assuming *arguendo* that a prosecutor's statement of the factual basis for a plea could be considered false testimony or evidence (because its assertion could only have been based on Jaime Mendoza's identification of Gonzalez), Mr. Gonzalez has not shown that the prosecutor knew it to be false at the time she made the statement. That is, the statement was made at a hearing on April 15, 2008; yet Jaime Mendoza did not inform any prosecutor or police officer of his recantation until three months later, at about the time of the Zuniga preliminary hearing on July 17, 2008. At the time the prosecutor made her "factual basis" statement, Jaime Mendoza had not begun his efforts to recant; to the contrary, the only statements from Jaime Mendoza at that point clearly identified Mr. Gonzalez as the man who stabbed Jorge Mendoza, Sr. Jaime Mendoza had identified Mr. Gonzalez as the stabber at the scene of the crime and at the police station; Jaime Mendoza had picked Mr. Gonzalez out of a photo lineup; and Jaime Mendoza had identified Mr. Gonzalez as the stabber in his initial statement made to Mr. Gonzalez's investigator. The California Supreme Court reasonably could have found that Mr.

---

[4] The "factual basis" statement was not a constitutional necessity for the plea. *See Loftis v. Almager*, 704 F.3d 645, 647-48 (9th Cir. 2012) (there is no constitutional requirement that a state trial court find a factual basis for a no-contest plea that is not accompanied by protestations of innocence).

United States District Court
For the Northern District of California

1  Gonzalez's *Napue* claim failed on each of the three elements of a *Napue* claim.[5]

2  Even assuming arguendo that *Napue* applies when a defendant has pled guilty -- a question

3  this Court need not reach -- the California Supreme Court's rejection of the *Napue* claim would

4  not have been an unreasonable application of, or contrary to, any clearly established law as set

5  forth by the U.S. Supreme Court.  Mr. Gonzalez is not entitled to the writ on this claim.

6  D.     Actual Innocence Claim

7  Mr. Gonzalez contends that he is actually innocent.  He urges that his actual innocence is

8  shown by the fact that Jaime Mendoza has recanted, because Jaime Mendoza's identification of

9  Mr. Gonzalez as the stabber was the only evidence against Mr. Gonzalez.

10  Mr. Gonzalez asserted in his petition for writ of habeas corpus in the California Supreme

11  Court that "[n]ewly discovered evidence showing that Petitioner is unquestionably innocent of the

12  offense(s) herein" shows a violation of his federal constitutional rights.  Docket No. 8-3 at 11.[6]

13  The California Supreme Court rejected the claim without discussion.  When, as here, the state

14  court has denied a federal constitutional claim on the merits without explanation, the federal

15  habeas court "must determine what arguments or theories supported or . . . could have supported,

16  the state court's decision; and then it must ask whether it is possible fairminded jurists could

17  disagree that those arguments or theories are inconsistent with the holding in a prior decision of

18  [the U.S. Supreme] Court."  *Harrington*, 562 U.S. at 102.

19  _____

20  [5] Unlike Respondent, this Court does not read this claim as a challenge to the voluntary and
intelligent nature of the guilty plea.  Mr. Gonzalez does not challenge the nature and quality of his

21  attorney's advice to plead guilty, or otherwise fault his attorney for the plea deal, which would be
the only avenue for relief in terms of the knowing and voluntary nature of the plea.  "Where, as

22  here, a defendant is represented by counsel during the plea process and enters his plea upon the
advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within

23  the range of competence demanded of attorneys in criminal cases.'. . . [A] defendant who pleads
guilty upon the advice of counsel 'may only attack the voluntary and intelligent character of the

24  guilty plea by showing that the advice he received from counsel'" was deficient.  *Hill v. Lockhart*,
474 U.S. 52, 56–57 (1985) (quoting *McMann v. Richardson*, 397 U.S. 759 (1970), and *Tollett v.*

25  *Henderson,* 411 U.S. 258, 267 (1973)).

26  [6] This Court cannot determine whether Mr. Gonzalez presented a federal-constitution-based actual
innocence claim to the Santa Cruz County Superior Court because neither Mr. Gonzalez nor

27  Respondent filed a copy of that state habeas petition.  The Santa Cruz County Superior Court's
order denying the habeas petition only mentioned a state-law-based actual innocence claim and

28  did not discuss any actual innocence claim under federal law.  *See* Docket No. 8-3 at 3-4.

Mr. Gonzalez is not entitled to relief on his claim that he is actually innocent. There are two problems with this claim: (a) the absence of a holding from the Supreme Court that a freestanding actual innocence claim can support federal habeas relief, and (b) the factual showing is too weak to support relief, even if habeas relief was available for an actual innocence claim.

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also House v. Bell*, 547 U.S. 518, 555 (2006); *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71 (2009) ("Whether such a federal right [to be released upon proof of actual innocence] exists is an open question. We have struggled with it over the years, in some cases assuming, arguendo, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet.").[7] Just recently, the Ninth Circuit observed that it is "still an open question" whether federal habeas relief is available based on a freestanding claim of actual innocence. *Taylor v. Beard,* 811 F.3d 326, 334 (9th Cir. 2016) (en banc) (citing *McQuiggin v. Perkins,* 133 S. Ct. 1924, 1931 (2013)).

Given the lack of a holding from the U.S. Supreme Court that there is a constitutional right to release based upon a showing of actual innocence, the California Supreme Court's rejection of Mr. Gonzalez's claim cannot be said to be "contrary to, or an unreasonable application of, clearly

---

[7] Allegations of actual innocence have a specific procedural purpose in the federal habeas context that is not applicable to Mr. Gonzalez's case. A federal court may hear the merits of successive, abusive, procedurally defaulted, or untimely claims if their failure to hear the claims would constitute a miscarriage of justice. The Supreme Court limits the "miscarriage of justice" exception to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Under this exception, a petitioner may establish a procedural "gateway" permitting review of defaulted claims if he demonstrates "actual innocence." *Schlup*, 513 U.S. at 316 & n.32; *see McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013) (*Schlup* actual innocence gateway available to excuse untimely petition). "[I]f a petitioner . . . presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316. Here, Mr. Gonzalez does not need to rely on the *Schlup* actual innocence gateway to have his other federal habeas claims considered because there is no federal habeas procedural problem with Mr. Gonzalez's federal habeas claims. His other federal habeas claims have been adjudicated on the merits and not rejected for some procedural reason such as a procedural bar or untimeliness.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. §

2    2254(d)(1).

3        Further, Mr. Gonzalez has not shown that he is actually innocent, even assuming arguendo

4    that such a claim could support federal habeas relief.  His evidence that the only witness against

5    him has recanted does not establish his actual innocence.  Recantations are looked upon with

6    skepticism, and in this case there is reason for skepticism -- a gang backdrop and facts suggesting

7    the recantation was the product of fear of retaliation.

8        The case of *Jones v. Taylor*, 763 F.3d 1242 (9th Cir. 2014), is instructive on evaluating

9    recanting witnesses.  There, the petitioner had been convicted of sexual assault of his 9-year-old

10   sister based on testimony from the victim, their father, and the victim's sister.  Several years after

11   the conviction, petitioner sought habeas relief based on the fact that the three witnesses recanted

12   their testimony.  The district court granted habeas relief on a freestanding actual innocence claim,

13   and the Ninth Circuit reversed.  *Id.* at 1246.  The Ninth Circuit noted that it had not resolved

14   "whether a freestanding actual innocence claim is cognizable in the non-capital context, although

15   [it had] assumed that such a claim is viable," *id.* at 1246, but found it unnecessary to decide

16   whether such a claim was cognizable because the petitioner had not made a sufficient showing.

17   *Id.* at 1246. The court was skeptical of the recantations and explained that they were insufficient to

18   establish actual innocence under the high standards set by the Supreme Court.

19
20           [Jones' evidence] is all in the form of recantation testimony,
             uncorroborated by any other evidence. As a general matter,
21           "[r]ecantation testimony is properly viewed with great suspicion."
             *Dobbert v. Wainwright*, 468 U.S. 1231, 1233, 105 S. Ct. 34, 82
22           L.Ed.2d 925 (1984) (Brennan, J., dissenting from denial of
             certiorari*); see also Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir.
23           2005). "Recanting testimony is easy to find but difficult to confirm
             or refute: witnesses forget, witnesses disappear, witnesses with
24           personal motives change their stories many times, before and after
             trial." *Carriger*, 132 F.3d at 483 (Kozinski, J., dissenting). "It upsets
25           society's interest in the finality of convictions, is very often
             unreliable and given for suspect motives...." *Dobbert*, 468 U.S. at
26           1233–34, 105 S. Ct. 34. For these reasons, a witness' "later
             recantation of his trial testimony does not render his earlier
27           testimony false." *Allen*, 395 F.3d at 994*; see also Christian v.
             Frank*, 595 F.3d 1076, 1084 n. 11 (9th Cir.2010). Rather, a witness'
28           recantation is considered in addition to his trial testimony and in the
             context in which he recanted when assessing the likely impact it

1

2

3

> would have on jurors. *See Christian*, 595 F.3d at 1084 n. 11
> (considering the timing of the witness' recantation and the contents
> of his earlier testimony in assessing the weight of the recantation);
> *Graves v. Cockrell*, 351 F.3d 143, 153 (5th Cir.2003) (noting that a
> recanting witness had given numerous contradictory statements in
> assessing the weight to give to his new testimony).

4   *Jones*, 763 F.3d at 1248.  The Ninth Circuit was skeptical of the recantations because, among

5   other things, they were all from family members, "which reduces their weight and reliability."  *Id.*

6   at 1249 (citing *House*, 547 U.S. at 552 (noting that testimony by friends or relations of the accused

7   might have less probative value than testimony from disinterested witnesses); *McCray v.*

8   *Vasbinder*, 499 F.3d 568, 573 (6th Cir. 2007) (noting that family members might have a personal

9   stake in a defendant's exoneration).)

10          More importantly, the Ninth Circuit concluded in *Jones* that, even if the recantations were

11   accepted as truthful, the recantations were insufficient to demonstrate actual innocence.  Two of

12   the three witnesses had heard alleged confessions and had not witnessed the abuse, so "their

13   testimony is of little weight in the actual innocence analysis."  *Jones*, 763 F.3d at 1249.  That left

14   the victim's recantation "as the most compelling evidence of Jones' innocence" but even that was

15   insufficient to establish actual innocence because the Ninth Circuit could not "say that every juror

16   would credit her recantation testimony over her trial testimony and the descriptions of the abuse

17   she gave in her 2000 and 2002 interviews."  Jones, 763 F.3d at 1250.  Her recantation did not

18   occur until 13 years after the events, and a reasonable juror could conclude that her memory faded

19   or changed, and therefore could credit the testimony closer in time to the sexual assault.  Also,

20   issues related to her misunderstanding of her anatomy had been raised at the trial, yet the jury

21   voted to convict.

22

23

24

25

26

27

28

> The most that can be said of the new testimony is that it undercuts
> the evidence presented at trial. Evidence that merely undercuts trial
> testimony or casts doubt on the petitioner's guilt, but does not
> affirmatively prove innocence, is insufficient to merit relief on a
> freestanding claim of actual innocence. *See House*, 547 U.S. at 555,
> 126 S. Ct. 2064 (rejecting freestanding actual innocence claim even
> though the petitioner had "cast considerable doubt on his guilt");
> *Jackson*, 211 F.3d at 1165 (rejecting a freestanding actual innocence
> claim even though the petitioner's new evidence "certainly cast
> doubt on his conviction"); *Carriger*, 132 F.3d at 477 (rejecting a
> freestanding claim when the postconviction evidence "serve[d] only

United States District Court
For the Northern District of California

1    to undercut the evidence presented at trial, not affirmatively to prove
     [the petitioner's] innocence").

2    There is no "new and reliable physical evidence, such as DNA, that
3    would preclude any possibility of [Jones's] guilt." *Carriger*, 132
     F.3d at 477. Nor is there scientific or testimonial evidence even as
4    persuasive as the evidence in *House* and *Jackson*, which was found
     to be insufficient. The recantations here are not from disinterested
5    eyewitnesses, and, although victim recantation might in some
     instances be evidence of innocence, *see Gandarela*, 286 F.3d at
6    1086, for the reasons discussed above, the recantation here is not
     sufficiently reliable that we can conclude that every juror would
7    credit it.

8    *Jones*, 763 F.3d at 1251.

9          Here, Mr. Gonzalez has not shown that he is actually innocent.  Although unlike *House*

10   and *Jones*, there is no other testimonial evidence supporting the conviction, there was a guilty plea

11   here.  This weighs against the finding of actual innocence.  At the change-of-plea hearing, Mr.

12   Gonzalez stated that he was guilty of assault with a deadly weapon.  "[T]he representations of the

13   defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the

14   judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.

15   Solemn declarations in open court carry a strong presumption of verity."  *Blackledge v. Allison*,

16   431 U.S. 63, 73-74 (1977).

17         Although, unlike the situation in *Jones*, Jaime Mendoza did not have a familial relationship

18   with the defendant that made his recantation suspect, there were two other circumstances that cast

19   doubt on the verity of his recantation.  The first circumstance was that Jaime Mendoza's

20   recantation of his identification of Mr. Gonzalez (who was connected to the Watsonville City

21   Hallers criminal street gang) occurred after Jaime Mendoza's car was set on fire.  On the night his

22   car was torched, Jaime Mendoza told a police officer that he believed the car had been set on fire

23   to retaliate against him for cooperating with the police.  Although Jaime Mendoza later stated that

24   he had decided that the arson was not a retaliatory act, one could disbelieve his disavowal of his

25   earlier belief.  A recantation by a witness who thinks he is being retaliated against for cooperating

26   with police in investigating a crime committed by a gang affiliate is of doubtful credibility.

27         The other circumstance casting doubt on Jaime Mendoza's recantation was the fact that he

28   lied about his earlier inculpatory statements and only admitted to making them when confronted

21

1    with objective evidence that he had made the statements.  Two examples highlight this problem.

2    First, at the evidentiary hearing on May 2, 2013, Jaime Mendoza testified that he did not recall

3    telling officer McKinley that someone named Peligroso (i.e., Mr. Gonzalez's street moniker)

4    stabbed both him and his father; Jaime Mendoza only admitted that he had made the statement to

5    officer McKinley after he was confronted with the police report showing the statement.  5/2/13 RT

6    7-9.  At the same evidentiary hearing, when confronted with the contradictory behavior of both

7    recanting to the police officers outside the Zuniga preliminary hearing and testifying at that same

8    preliminary hearing that Mr. Gonzalez *did* stab his father, Jaime Mendoza insisted that he had

9    testified at the preliminary hearing that everything he had told the police at the time of the

10   stabbing was a lie, 5/2/13 RT 21-23, and only admitted that he did not recant while testifying at

11   the Zuniga preliminary hearing after being shown the transcript of his testimony, 5/2/13 RT 38.

12   This latter falsity is particularly glaring because, after the Zuniga preliminary hearing and before

13   Mr. Gonzalez's evidentiary hearing, Jaime Mendoza signed a declaration in which he recanted his

14   testimony at the Zuniga preliminary hearing, and that declaration shows that he knew he had

15   inculpated Mr. Gonzalez at the preliminary hearing.

16          In sum, the evidence that Jaime Mendoza recanted his identification of Mr. Gonzalez as the

17   stabber would not demonstrate actual innocence because the Court cannot say that "every juror

18   would credit [his] recantation testimony" over his earlier statements to police (made close in time

19   to the incident) and at the Zuniga preliminary hearing which identified Mr. Gonzalez as the person

20   who stabbed his father.  *See Jones*, 763 F.3d at 1250.  There is no new and reliable physical

21   evidence that precludes any possibility of Mr. Gonzalez's guilt.  *See id.* at 1251.  A trier of fact

22   would be presented with conflicting statements from an eyewitness and no physical evidence

23   pointing toward or away from guilt.  That state of the evidence is not enough to support a finding

24   of actual innocence, even if such federal habeas relief was generally available upon a showing of

25   actual innocence.  Mr. Gonzalez is not entitled to the writ on his actual innocence claim.

26   E.     No Certificate of Appealability

27          A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in

28   which "reasonable jurists would find the district court's assessment of the constitutional claims

debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is **DENIED**.

## VI.    CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.


**IT IS SO ORDERED**.


Dated: May 31, 2016

_____
EDWARD M. CHEN
United States District Judge